**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MOST REVEREND DAVID A ZUBIK, BISHOP OF THE ROMAN CATHOLIC DIOCESE OF PITTSBURGH, as Trustee of The Roman Catholic Diocese of Pittsburgh, a Charitable Trust; The ROMAN CATHOLIC DIOCESE OF PITTSBURGH; CATHOLIC CHARITIES OF THE DIOCESE OF PITTSBURGH, INC., an affiliate nonprofit corporation of The Roman Catholic Diocese of Pittsburgh; and THE CATHOLIC CEMETERIES ASSOCIATION OF THE DIOCESE OF PITTSBURGH, an affiliate nonprofit corporation of The Roman Catholic Diocese of Pittsburgh, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) 2:  12-cv-00676 ) ) |
| KATHLEEN SEBELIUS, in her official capacity as Secretary of the U.S. Department of Health and Human Services; HILDA SOLIS, in her official capacity as Secretary of the U.S. Department of Labor; TIMOTHY GEITHNER, in his official capacity as Secretary of the U.S. Department of Treasury; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; U.S. DEPARTMENT OF LABOR; and U.S. DEPARTMENT OF TREASURY, | ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

**MEMORANDUM OPINION AND ORDER OF COURT**

Presently pending before the Court is the  DEFENDANTS' MOTION TO DISMISS,

with brief in support (Document Nos. 17 and 18), the PLAINTIFFS' MEMORANDUM IN

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (Document No. 27), and the

1

REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS (Document No. 40).[1]  The

issues have been fully briefed and the matter is ripe for disposition.

Plaintiffs bring this action for declaratory and injunctive relief claiming that regulations

promulgated pursuant to the Patient Protection and Affordable Care Act, Pub. L. No. 111-148,

124 Stat. 119 (March 23, 2010) (codified as amended in scattered sections of titles 21, 25, 26, 29

and 42 of the United States Code), as amended by the Health Care and Education Reconciliation

Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 (March 30, 2010) (codified in scattered

sections of titles 20, 26, and 42 of the United States Code) (collectively referred to as the

"Affordable Care Act" or "ACA") violate the Religious Freedom Restoration Act ("RFRA"), the

First Amendment to the U.S. Constitution, and the Administrative Procedure Act ("APA").  The

Women's Health Amendment ("WHA") to the ACA, 42 U.S.C. § 300gg-13(a)(4) (March 23,

2010), requires covered employers to offer group health plans[2] that provide women with certain

forms of preventive services, including "FDA-approved contraception methods" and

contraceptive counseling.[3]   "FDA-approved contraceptive methods" include oral contraceptives,

"emergency contraceptive" abortifacients (such as Plan "B" and "Ella"), and intrauterine

devices.  *Legatus v. Sebelius*, -- F. Supp. 2d ---, 2012 WL 5359630 (E. D. Mich. Oct. 31, 2012)

(citing FDA, Birth Control Guide (Aug. 2012) (available at

http://www.fda.gov/ForConsumers/By Audience/For Women/ucm 18465).  Plaintiffs argue that

---

[1]  Call to Action Pennsylvania, Catholics for Social Justice, Pittsburgh Area Pax Christi and the
Association of Pittsburgh Priests have submitted an amicus curiae brief in support of
Defendants' motion to dismiss (Document No. 30), and The American Center for Law & Justice
and Seventy-Nine (79) Members of the United States Congress have submitted an amicus curiae
brief in support of Plaintiffs' opposition to the motion to dismiss (Document No. 25).

[2]  The term "group health plans" includes both insured and self-insured group health plans.  76
Fed.Reg. 46,621, 46,622.

[3]  Prior to the introduction of the WHA, the ACA did not cover preventive services for women.

requiring them to cover contraceptive services that their faith deems contrary to its religious tenets impinges upon their religious freedom.

Defendants have moved to dismiss the entire complaint[4] pursuant to Federal Rule of Civil Procedure 12(b)(1), arguing that Plaintiffs' claims are not ripe and that Plaintiffs lack standing. Plaintiffs strenuously oppose Defendants' motion contending that the ACA and its regulations are "final" and are causing immediate impact and cognizable injury to Plaintiffs.

After careful and deliberate consideration, the Court concludes that, in light of the clear and concrete steps that Defendants are taking to address the concerns of Plaintiffs, including their commitment not to enforce the challenged regulations against Plaintiffs while accommodations are under consideration, and in any event no sooner than January 2014, Plaintiffs' claims are not ripe for judicial review and that Plaintiffs have not alleged an injury in fact under existing law sufficient to establish standing. Therefore, for the reasons hereinafter stated, Defendants' motion to dismiss will be granted and Plaintiffs' Complaint will be dismissed without prejudice in its entirety.

---

[4] In actuality, the Motion to Dismiss directly challenges only three counts of the Complaint, Count I - Substantial Burden on Religious Exercise In Violation of the Religion Freedom Restoration Act; Count II - Substantial Burden on Religious Exercise In Violation of the Free Exercise Clause of the First Amendment; and Count VI - Compelled Speech in Violation of the Free Speech Clause of the First Amendment. As will be discussed *infra*, Defendants argue that "there is a substantial likelihood that all of plaintiffs' claims will be materially affected, if not made entirely irrelevant, by changes to the regulations, and this Court should dismiss all plaintiffs' claims." Reply Br. at 15 (Document No. 40).

## Background[5]

A.    <u>The Parties</u>

Plaintiff Most Reverend David A. Zubik, Bishop of The Roman Catholic Diocese of Pittsburgh, is the Trustee of The Roman Catholic Diocese of Pittsburgh (the "Diocese"), a Pennsylvania Charitable Trust. The Diocese is organized exclusively for charitable, religious, and educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code. The Diocese is comprised of 206 parishes and their charitable trusts and employs over 140 people. The employees of the Diocese are individuals of all faiths.

The Diocese serves the community through its affiliated Catholic schools, which include approximately sixty-six (66) elementary schools, eleven (11) high schools, two (2) non-residential schools for individuals with disabilities, and various preschool programs. The Diocesan schools are open to and serve all children, without regard to the students' religion, race or financial condition. Complaint, ¶¶ 26-30.

The Diocese also provides numerous social services to the residents of its six-county community and assists the work of many other local organizations.

The Diocese operates a self-insured plan of health care coverage through the Catholic Employers Benefits Plan Delaware Trust (the "Catholic Employers Benefits Plan"), which functions as the insurance company underwriting the medical care costs of covered employees, with all funding coming from the Diocese and its covered entities. The Catholic Employers Benefits Plan insures employees of the Diocese, all of the Diocesan parishes and schools, and several other affiliated entities.

---

[5] The following facts are taken from the Complaint and are not findings of fact by the Court. Instead, the Court will assume the facts in the Complaint to be true for the purpose of the pending 12(b)(1) motion to dismiss.

The Diocesan health care plans are administered by Third Party Administrators, who are paid a flat fee for each covered individual for administering the plans but who do not pay for any services received by covered employees. The next Diocesan health care plan year begins January 1, 2013. The health care plans offered by the Diocese to its employees are all "grandfathered"[6] under the ACA.

Plaintiff Catholic Charities of the Diocese of Pittsburgh, Inc. ("Catholic Charities") is a non-profit corporation affiliated with the Diocese. It is organized exclusively for charitable, religious, and educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code. Catholic Charities is the primary social service agency of the Diocese. The mission of Catholic Charities is to serve all regardless of religious affiliation in their time of greatest need. Catholic Charities employs and serves individuals of all faiths.

Prior to July 1, 2012, Catholic Charities contracted with insurer Highmark Blue Cross Blue Shield to offer health care coverage to its employees. However, commencing on July 1, 2012, Catholic Charities' health care plan is covered by the Diocese's self-insurance, through the Catholic Employers Benefit Plan, and is administered by a Third Party Administrator. Catholic Charities' next health care plan year, under the Catholic Employers Benefit Plan, will begin on January 1, 2013.

---

[6] "Grandfathered" health plans are generally exempt from the "preventive health care services" requirement of the ACA. Interim Final Rules for Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 75 Fed. Reg. 41,726, 41,731 (July 19, 2010). For a comprehensive summary of the applicability of ACA provisions to grandfathered health plans, *see* Application of the New Health Reform Provisions of Part A of Title XXVII of the PHS Act to Grandfathered Plans, available at www.dol.gov/ebsa/pdf/grandfatherregtable.pdf. Grandfathered health plans cannot undergo substantial change after March 23, 2010 without losing grandfathered status; however the interim final regulations generally permit plan sponsors and issuers to make voluntary changes to increase benefits, to conform to required legal changes, and to adopt voluntarily other consumer protections in the ACA. 75 Fed. Reg. 34538-01, 34546 (June 17, 2010).

Plaintiff Catholic Cemeteries maintains perpetual resting places for the deceased in sixteen (16) Association-owned cemeteries and provides burial-related services to individuals. While cemetery plots can only be owned by Catholics, deceased persons from any religion can be buried in the cemeteries. Whenever asked, Catholic Cemeteries also provides free burial space to indigents, as well as free products and services connected with a burial.

Additionally, Catholic Cemeteries also serves women and men dealing with issues of grief, anger, guilt, or forgiveness related to an abortion experience.

Employment at Catholic Cemeteries is not limited to Catholics and Catholic Cemeteries does not inquire into its employees' religious beliefs. Catholic Cemeteries provides its employees with four (4) health care plan options. All four health care plans are self-insured by the Catholic Employers Benefits Plan. The next plan year for Catholic Cemeteries' health care plan begins on January 1, 2013. Three of Catholic Cemeteries' health care plan options are grandfathered. One of Catholic Cemeteries' health care plan options is not grandfathered, as Catholic Cemeteries changed its insurer for that health care plan between March 23, 2010 and November 15, 2010, in part, to avoid adding contraceptive coverage to that plan. Complaint, at ¶¶ 64 - 79.

Defendants are the U.S. Department of Health and Human Services ("HHS"), Kathleen Sebelius in her official capacity as Secretary of HHS , the U.S. Department of Labor ("DOL"), Hilda L. Solis in her official capacity as Secretary of DOL, U. S. Department of Treasury, and Timothy F. Geithner in his official capacity as Secretary of Treasury. Collectively, Defendants are the departments and officials responsible for adopting, administering, and enforcing the regulations to which Plaintiffs object.

B.    The Relevant Statutes and Regulations

This case is one of forty (40) lawsuits which challenge the ACA's  preventive services

regulations regarding their requirements relating to contraception.[7]  *See* The

Becket Fund for Religious Liberty--HHS Mandate Information Central,

www.becketfund.org/hhsinformationcentral (last visited November 26, 2012).

The ACA, signed into law on March 23, 2010, instituted a variety of alleged health care

reforms.  Most relevant to this lawsuit, the ACA requires group health care plans to provide no-

cost coverage for "preventive care" and screening for women.  42 U.S.C. § 300gg-13(a)(4).  The

ACA did not, however, specifically define the contours of "preventive care."  Rather, it

delegated that responsibility to the Health Resources and Services Administration ("HRSA"), an

---

[7]  Opinions have been issued in eight (8) cases:

(i) in three cases, the defendants' motion to dismiss was granted on the issues of standing and ripeness, *to wit:  State of Nebraska v. Sebelius*, -- F.Supp.2d -, 2012 WL 2913401 (D. Neb. July 17, 2012), *appeal docketed,* No. 12-3238 (8th Cir. Sept. 25, 2012); *Belmont Abbey College v. Sebelius,* -- F.Supp.2d --, 2012 WL 2914417 (D.D.C. July 18, 2012), *appeal docketed,* No. 12-5291 (C.A.D.C. Sept. 20, 2012*);*  and *Wheaton College v. Sebelius*, -- F.Supp.2d --, 2012 WL 3637162 (D.D.C. August 24, 2012), *appeal docketed,* No. 12-5273 (C.A.D.C. Aug. 30, 2012);
(ii) in another, the defendants' motion to dismiss was granted on the merits, *O'Brien v. United States Department of Health and Human Services*, -- F.Supp.2d --, 2012 WL 4481208 (E.D. Mo., Sept. 28, 2012), *appeal docketed,* No. 12-3357 (8th Cir. Oct. 4, 2012);
(iii) in two others, plaintiffs' motion for preliminary injunction was granted:  *Newland v. Sebelius*, -- F.Supp.2d --, 2012 WL 3069154 (D. Colo. July 27, 2012), *appeal docketed,* No. 12-1380 (10th Cir. Sept. 26, 2012) and *Tyndale House Publishers v. Sebelius*, --- F. Supp.2d ---, 2012 WL 5817323 (D.D.C. Nov. 16, 2012);
(iv) in one other, the plaintiffs' motion for preliminary injunction was granted as to the individual and the for-profit secular plaintiffs, but the district court found that the non-profit organization plaintiff did not have standing:  *Legatus v. Sebelius*, --- F. Supp.2d ---, 2012 WL 5359630 (E.D. Mich. Oct. 31, 2012); and
(v) in one other, the plaintiff's motion for preliminary injunction was denied as the court found that corporations did not have protected rights under the Free Exercise Clause and that the individual plaintiffs did not show a likelihood of success on the merits as to either their free exercise or RFRA claims.  *Hobby Lobby Stores, Inc. v. Sebelius*, -- F. Supp.2d ---, 2012 WL 5844972 (W.D. Okla. Nov. 19, 2012), *appeal docketed,* No. 12-6294 (10th Cir. Nov. 20, 2012).

agency of HHS.  On August 1, 2011, HRSA issued its Required Health Plan Coverage

Guidelines that defined the scope of women's preventive services for purposes of the ACA.  The

HRSA Guidelines include, *inter alia*, "the full range of Food and Drug Administration-approved

contraceptive methods, sterilization procedures, and patient education and counseling for women

with reproductive capacity."  HRSA, Women's Preventive Services:  Required  Health Plan

Coverage Guidelines at www.hrsa.gov/womensguidelines/.

However, the preventive care coverage requirement does not apply to grandfathered

health plans and certain religious employers are exempt from any requirement to provide

coverage for contraceptive services.  *See* Interim Final Rules for Group Health Plans and Health

Insurance Issuers Relating to Coverage of Preventive Services Under The Patient Protection and

Affordable Care Act, 76 Fed. Reg. 46621 (Aug. 3, 2011).  In order to qualify as a "religious

employer," an employer must meet the following criteria:

> (1)  Has the inculcation of religious values as its purpose.
> (2)  primarily employs persons who share its religious tenets;
> (3)  primarily serves persons who share its religious tenets; and.
>  (4)  is a non-profit organization under section 6033(a)(1) and section
> 6033(a)(3)A)(i) or (iii) of the Code.  Section 6033(a)(3)(A)(i) and (iii) refer to
> churches, their integrated auxiliaries, and conventions or associations of churches,
> as well as to the exclusively religious activities of any religious order . . . .

76 Fed. Reg. 46,621, 46,623 (codified at 45 C.F.R. §147.130(A)(1)(IV)(b)).

On February 10, 2012, the final regulations concerning the religious exemption were

posted.[8]  In addition to posting the final regulations, HHS issued a bulletin which established a

temporary enforcement "safe-harbor" for group health care plans sponsored by certain non-profit

organizations with religious objections to contraceptive coverage that do not qualify for the

---

[8]  In the final regulations, Defendants adopted without change the definition of "religious
employer" as defined in the amended interim final regulations.  77 Fed.Reg. 8725.

8

religious employer exemption.[9]  The bulletin confirmed that during the temporary enforcement

safe harbor period, Defendants will not take any enforcement action against any employer, group

health care plan, or group health care insurance issuer with respect to a non-grandfathered plan

that fails to cover some or all of the recommended contraceptive services and that is sponsored

by an organization that meets the following criteria:

> 1.  The organization is organized and operates as a non-profit entity;

> 2.  From February 10, 2012, onward, contraceptive coverage has not been provided at any point by the group health plan established or maintained by the organization, consistent with any applicable [s]tate law, because of the religious beliefs of the organization;

> 3.  . . .  [T]he group health plan established or maintained by the organization (or another entity on behalf of the plan, such as a health insurance issuer or third-party administrator) must provide [notice] to participants . . . stat[ing] that contraceptive coverage will not be provided under the plan for the first plan year beginning on or after August 1, 2012.

> 4.  The organization self-certifies that it satisfies criteria 1 - 3 above  . . . .

HHS, Guidance on the Temporary Enforcement Safe Harbor, February 10, 2012.  At the same

time, Defendants announced that they "will work with stakeholders to develop alternative ways

of providing contraceptive coverage without cost sharing with respect to non-exempted, non-

profit religious organizations with religious objections to such coverage."  77 Fed.Reg. 8725,

8728.   On August 15, 2012, HHS reissued the bulletin originally issued on February 10, 2012,[10]

stating that it was not "changing the February 10 policy, but was clarifying three points: (1)  that

---

[9]  *See* http://cciio.cms.gov/resources/files/Files2/0210212/20120210-Preventive-Services-Bulletin.pdf.

[10]  It appears that the August 2012 Guidance was issued in response to the lawsuit filed by Wheaton College.  In its Complaint, Wheaton College alleged that it was not eligible for the temporary safe harbor.  In their motion to dismiss, Defendants "announced an interpretation of the safe harbor criteria encompasses Wheaton, and this interpretation [was] formalized in the August 2012 Guidance."  *Wheaton College v. Sebelius*, 2012 WL 3637162, *9  n. 4 (D.D.C. Aug. 24, 2012).

the safe harbor is also available to non-profit organizations with religious objections to some but not all contraceptive coverage . . .; (2) that group health plans that took some action to try to exclude or limit contraceptive coverage that was not successful as of February 10, 2012, are not for that reason precluded from eligibility for the safe harbor . . .; and (3) that the safe harbor may be invoked without prejudice by non-profit organizations that are uncertain whether they qualify for religious employer exemption . . . ." HHS, Guidance on the Temporary Enforcement Safe Harbor, August 15, 2012 at n.1. *See* http://cciio.cms.gov/resources/files/prev-services-guidance-08152012.pdf.

The "safe harbor provides an additional year for these group health plans and group insurance issuers (i.e., until the first plan beginning on or about August 1, 2013)" to comply with HRSA guidelines regarding contraceptive coverage. *Id.* at 3.

On March 21, 2012, Defendants published an "advance notice of proposed rulemaking" ("ANPRM"), in which they announced the intentions of the Defendants to propose amendments that "would establish alternative ways to fulfill the requirements of [the ACA] when health coverage is sponsored or arranged by a religious organization that objects to the coverage of contraceptive services for religious reasons and that is not exempt under the final regulations published February 15, 2012." 77 Fed.Reg. 16,501. The ANPRM notes that one of the goals of Defendants is "to protect . . . religious organizations from having to contract, arrange, or pay for contraceptive coverage," while also maintaining contraceptive coverage without cost sharing for individuals who receive coverage through those organizations. 77 Fed.Reg. 16,501, 16,503. "In short, the ANPRM is 'the first step toward promulgating . . . amended final regulations' prior to the end of the temporary enforcement safe harbor that will 'accommodat[e] non-exempt, non-profit religious organizations' religious objections to covering contraceptive services and

assur[e] that participants and beneficiaries covered under such organizations' plans receive contraceptive coverage without cost sharing." *Nebraska v. HHS*, -- F.Supp.2d --, 2012 WL 2913402, *5 (D. Neb. July 17, 2012) (quoting 77 Fed.Reg. 16,501, 16,503).

The ANPRM also states that following the ninety-day comment period on the ANPRM, Defendants will publish a Notice of Proposed Rulemaking (NPRM), which will afford the public with another opportunity for comment before amended final regulations are issued. 77 Fed.Reg. 16,503. Public comments were due on or before June 19, 2012, and the Regulations.gov web site reports that approximately 63,171 comments were received by the close of the comment period. *See* http://www.regulations.gov.

## Standard of Review

A motion to dismiss pursuant to Rule 12(b)(1) contends that the district court lacks subject-matter jurisdiction. Such a motion questions the court's "very power to hear the case" and is considered either "facial," that is, one which attacks the complaint on its face, or "factual," one which attacks subject matter jurisdiction as a matter of fact. *Mortensen v. First. Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977); *see also Petruska v. Gannon Univ.*, 462 F.3d 294, 302, n. 3 (3d Cir. 2006), *cert. denied*, 550 U.S. 903 (2007). When a motion to dismiss pursuant to Rule 12(b)(1) is filed prior to the defendant filing an answer to the complaint, it is, by definition, a facial attack. *Zimmerman v. Wolff*, 622 F.Supp.2d 240, 243 (E.D. Pa. 2008); *see also Mortensen*, 549 F.2d at 891, n. 17 (a "factual jurisdictional proceeding cannot occur until plaintiff's allegations have been controverted."). Defendants have not filed an answer and the parties do not contest that Defendants are challenging jurisdiction on the face of the complaint.

"Facial attacks . . . contest the sufficiency of the pleadings, and the trial court must accept the complaint's allegations as true." *Common Cause v. Pennsylvania*, 558 F.3d 249, 257

(3d Cir. 2009) (quoting *Taliaferro v. Darby Twp. Zoning Bd.*, 458 F.3d 181, 188 (3d Cir. 2006)). The court's review is limited to "the allegations on the face of the complaint . . . and any documents referenced in the complaint, viewed in the light most favorable to the plaintiff." *Church of the Universal Bhd. v. Farmington Twp. Supervisors*, 296 Fed. Appx. 285, 288 (3d Cir. 2008) (citing *Mortensen,* 549 F.2d at 891, and *Turicentro, S.A. v. Am. Airlines, Inc.*, 303 F.3d 293, 300 (3d Cir. 2002)). A complaint under facial attack may be properly dismissed "only when the claim 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or . . . is wholly insubstantial and frivolous.' " *Kehr Packages v. Fidelcor, Inc.*, 926 F.2d 1406, 1408–09 (3d Cir. 1991) (quoting *Bell v. Hood*, 327 U.S. 678, 682 (1946)); *see also Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424, 438 (D.N.J. 1999) (such a complaint should be dismissed "only if it appears to a certainty that the plaintiff will not be able to assert a colorable claim of subject matter jurisdiction."). The United States Court of Appeals for the Third Circuit has warned district courts against treating a motion under Rule 12(b)(1) identically to one brought under Rule 12(b)(6) which reaches the merits of the claim, noting that "the standard for surviving a Rule 12(b)(1) motion is lower than that for a 12(b)(6) motion." *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 178 (3d Cir. 2000). The plaintiff has the burden of establishing that jurisdiction is timely and proper in this Court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

## Discussion

The Declaratory Judgment Act provides that "in a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such a declaration . . . ." 28 U.S.C. § 2201(a). Jurisdiction is dependent on the existence of a "case or controversy" as required by Article III of the United

States Constitution.  " 'This language restricts the federal judicial power to the traditional role of the Anglo-American courts' and thereby prevents courts from taking 'possession of almost every subject proper for legislative discussion and decision.' "  *New Jersey Physicians, Inc. v. President of the United States*, 653 F.3d 234, 237 (3d Cir. 2011) (quoting *Ariz. Christian Sch. Tuition Org. v. Winn*, -- U.S. --, 131 S. Ct. 1436, 144-42 (2011)).

" 'Courts enforce the case-or-controversy requirement through the several justiciability doctrines,' which 'include standing, ripeness, mootness, the political-question doctrine, and the prohibition on advisory opinions.' "  *New Jersey Physicians,* 653 F.3d at 238 (quoting *Toll Bros., Inc. v Twp. of Readington*, 555 F.3d 131, 137 (3d Cir. 2009)).

Plaintiffs argue that they "cannot, without violating their sincerely-held religious beliefs, offer coverage [for preventive care] or other devices, drugs, procedures, or services that are inconsistent with the teachings of the Catholic Church."  Complaint at ¶ 162.

Defendants argue that at this time no justiciable controversy exists because Plaintiffs are not subject to enforcement on the challenged regulations until at least January 1, 2014, if at all. Presently, Plaintiffs qualify for a number of exemptions.[11]  For example, the health care plans offered by the Diocese and three of the four  plans offered by Catholic Cemeteries are exempt by virtue of the ACA grandfather provisions.  Additionally, all of the health care plans offered by Plaintiffs are exempt by virtue of the temporary safe harbor provision until at least January 1,

---

[11]  This distinguishes the current case from *O'Brien v. HHS*, 2012 WL 4481208 (E.D. Mo. Sept. 28, 2012), in which the plaintiff, a secular, for-profit company, did not qualify for any exemptions.  Rather, this case is akin to other cases against HHS that have been dismissed for lack of Article III standing or ripeness.  *See., e.g., Wheaton College v. Sebelius*, 2012 WL 3637162 (D.D.C. Aug. 24, 2012); *Belmont Abbey College v. Sebelius*, 2012 WL 2914417 (D.D.C. July 18, 2012); and *Nebraska v. HHS*, 2012 WL 2913402 (D. Neb. July 17, 2012).

2014.  Accordingly, Defendants argue that the controversy is not ripe and that Plaintiffs do not have standing to sue at this time.[12]

The Court will examine each of these contentions seriatim.

## A.    Ripeness[13]

"A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300, (1998). Yet "ripeness is a matter of degree whose threshold is notoriously hard to pinpoint." *Pittsburgh Mack Sales & Serv. Inc. v. Int'l Union of Operating Eng'rs, Local Union,* 580 F.3d 185, 190 (3d Cir. 2009) (citation omitted).  This task is particularly difficult in declaratory judgment actions because they are often sought before a completed injury has occurred. *Id.*

In *Abbott Lab. v. Gardner*, 387 U.S. 136, 149 (1967), *overruled on other grounds, Califano v. Sanders,* 430 U.S. 99, 105 (1977) *and Pacific Gas  & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983), the United States Supreme Court held that ripeness turns on  "the fitness of the issue for judicial decision" and "the hardship to the parties of withholding court consideration."  The United States Court of Appeals for the

---

[12]  Ripeness, which determines <u>when</u> a party may bring a claim, provides a slightly more narrow ground for dismissal than standing, which implicates the question of <u>who</u> may bring suit.  *See Joint Stock Soc'y v. UDV North Am., Inc.,* 266 F.3d 164, 174 (3d Cir. 2001) ("whereas ripeness is concerned with <u>when</u> an action may be brought, standing focuses on <u>who</u> may bring a ripe action.")

[13] Plaintiffs, relying on *Peachlum v. City of York, Pennsylvania,* 333 F.3d 429 (3d Cir. 2003), suggest that this case should be subject to a relaxed ripeness standard because it involves fundamental rights.  Pls' Opp'n at 15-16.  However, even under this relaxed standard, their claims would still not be ripe.  In *Peachlum*, the Third Circuit Court of Appeals indicated that, in such cases, "even the remotest threat of prosecution, such as the absence of a promise not to prosecute, has supported a holding of ripeness where the issues in the case were 'predominantly legal' and did not require additional factual development."  33 F.3d at 435.  In the case *sub judice*, it is not disputed that Defendants have provided a promise not to enforce, and further factual development is required to know whether, when, and how the challenged regulations will, in fact, apply to Plaintiffs.

Third Circuit has refined the ripeness test to evaluate whether an action for declaratory judgment is ripe. *Pic-A-State Pa, Inc. v. Reno,* 76 F.3d 1294, 1298 (3d Cir. 1996). Our appellate court has instructed:

> In determining whether to engage in pre-enforcement review of a statute in a declaratory judgment action, we look, among other factors, to (1) the adversity of the parties' interests, (2) the conclusiveness of the judgment, and (3) the utility of the judgment.

*Id.* (*citing Freehold Cogeneration Assocs. v. Bd. Reg. Comm'rs,* 44 F.3d 1178, 1188 (3d Cir.), *cert. denied,* 516 U.S. 815 (1995)); *Step-Saver Data Systems, Inc. v. Wyse Technology*, 912 F.2d 643, 647 (3d Cir. 1990).

   1. <u>Adversity of Interest</u>

  "[A] potential harm that is 'contingent' on a future event occurring will likely not satisfy this prong of the ripeness test." *Pittsburgh Mack Sales & Serv.,* 580 F.3d at 190 (citing *Step Saver*, 912 F.2d at 647-48). The party seeking review need not have suffered a "completed" harm, but there must be a substantial threat of real harm that remains throughout the litigation. *Presbytery of New Jersey of Orthodox Presbyterian Church v. Florio*, 40 F.3d 1454, 1463 (3d Cir. 1994). For instance, a declaratory judgment action is ripe if "a regulation requires immediate and significant change in the plaintiffs' conduct of their affairs." *Abbott Labs.*, 387 U.S. at 153. If, however, intervening events would remove the potential for harm, the controversy becomes speculative. *Presbytery*, 40 F.3d at 1463.

  Defendants argue that they have "initiated a rulemaking to amend the preventive coverage regulations to accommodate further the concerns expressed by plaintiffs and similarly situated organizations and have made clear that the amendments will be finalized well before the earliest date on which the challenged regulations could be enforced by defendants against

plaintiffs." Br. at 16. Plaintiffs respond that their claims are ripe because "they are challenging the *current* law, which is in effect and published in the C.F.R." Pl's Response at 17.

There is no doubt that the regulations challenged by Plaintiffs are "clearly definitive" by virtue of having been formally promulgated. *See Abbott Laboratories*, 387 U.S. at 152-53 (finding that pre-enforcement challenge to regulations was fit for judicial determination because the challenged regulation was "quite clearly definitive;" there was "no hint that [the] regulation [was] informal, or only the ruling of a subordinate official, or tentative;" and the regulation "was made effective upon publication." 387 U.S. at 151. *But see Belmont Abbey*, 2012 WL 2914417 at *12 (holding that "the challenged rule is not "sufficiently final" to satisfy the fitness prong of the ripeness inquiry."); *Wheaton*, 2012 WL 3637162, at *8 (holding that because the preventive services regulations are in the process of being amended, they are "by definition a tentative agency position . . . .").

However, an important distinction exists between this case and *Abbott Laboratories*. The Supreme Court found that the parties in *Abbott Laboratories* had a clear expectation that compliance with the regulations was expected. 387 U.S. at 152. In the instant case, Defendants have repeatedly stated that they intend to amend the regulations to address the concerns raised by religious organizations with religious objections to providing preventive services coverage. In fact, Defendants "have published their plan to amend the rule to address the exact concerns Plaintiff[s] raise[] in this action and have stated clearly and repeatedly in the Federal Register that they intend to finalize the changes before the enforcement safe harbor ends." *Belmont Abbey,* 2012 WL 2914417 at * 9. In addition, "Defendants have already initiated the amendment process by issuing an ANPRM." *Id.* As the United States Court of Appeals for the District of Columbia has observed, "[i]f the [agency's] position is likely to be abandoned or modified

before it is actually put into effect, then its review wastes the court's time and interferes with the process by which the agency is attempting to reach a final decision." *Continental Airlines, Inc. v. Civil Aeronautics Bd.,* 552 F.2d 107, 125 (D.C. Cir. 1975).

In this case, the safe harbor provisions of the regulation itself protects all of the Plaintiffs from any potential enforcement action until at least January 1, 2014. Further, the health care plan offered by the Diocese, as well as three of the four health care plans offered by Catholic Cemeteries, share additional protection under the regulations insofar as they are each grandfathered under the ACA.[14] Also it cannot be overlooked that through the ANPRM, Defendants have committed to amending the preventive services coverage regulations well before January 2014 to accommodate the religious objections of organizations such as Plaintiffs. As the *Belmont Abbey* court explained:

> [Defendants] have published their plan to amend the rule to address the exact concerns Plaintiff raises in this action and have stated clearly and repeatedly in the Federal Register that they intend to finalize the changes before the enforcement safe harbor ends. Not only that, but Defendants have already initiated the amendment process by issuing an ANPRM. The government, moreover, has done nothing to suggest that it might abandon its efforts to modify the rule -- indeed, it has steadily pursued that course -- and it is entitled to a **presumption that it acts in good faith**.

2012 WL 2914417, at *9 (internal citations omitted) (emphasis added). *See also Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 325 (5th Cir. 2009) ("Without evidence to the contrary, we assume that formally announced changes to official governmental policy are not more

---

[14] Plaintiffs argue that in light of increasing costs and a fluctuating regulatory environment, it is anticipated that they will lose their grandfather exemption from the ACA requirements in the foreseeable future. However, Plaintiffs do not allege that they intend to make - or are even contemplating - specific changes to their plans that would end their grandfathered status. Instead, Plaintiffs merely speculate and/or assume that they will lose grandfathered status **sometime** in the future.

litigation posturing."); *Comcast Corp. v. F.C.C.*, 526 F.3d 763, 762 n.2 (D.C. Cir. 2008) ("We must presume an agency acts in good faith . . .); *Legatus,* 2012 WL 5359630 at *5 (same).

Once the forthcoming amendments are finalized, if Plaintiffs' concerns are not resolved to their satisfaction, they "will have ample opportunity [ ] to bring [their] legal challenge at a time when harm is more imminent and more certain." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 734 (1998). As Defendants acknowledge, "if plaintiffs still believe their rights have been violated once the amended regulations are issued, they can file suit challenging them at that time and will have lost nothing in the interim." Reply Br. at 1.

As a result, the Court finds that this action fails to present sufficient adversity of interest between the parties.

### 2.     Conclusiveness

A declaratory judgment is conclusive if it definitively decides the rights of the parties. *Step Saver*, 912 F.2d at 649, n. 9. If a declaratory judgment is based on a contingency, however, it fails to change the parties' legal status, and becomes an exercise in futility. *Id*. at 649. In this lawsuit, even if Plaintiffs received the declaratory judgment they seek at this time, it would not affect their rights unless Defendants sought or threatened to bring an enforcement action against them. Since this has not occurred, and cannot occur under current law before January 2014, the issuance of a declaratory judgment would be futile.

### 3.     Utility

The purpose of the Declaratory Judgment Act is to provide useful judgments that clarify legal relationships so that parties can "make responsible decisions about the future." *Step–Saver*, 912 F.2d at 649. A judgment has utility if it affects the parties' plans of action. *Id*. There is no doubt that a declaratory judgment would be useful to Plaintiffs and affect their plans of action.

However, the mere fact that a declaratory judgment would be useful to assist Plaintiffs in making their upcoming operational decisions is insufficient to overcome the fact that no actual controversy yet exists between the parties. Therefore, the Court finds that a declaratory judgment would be of remarkably little utility at this stage. *See Armstrong World Indus. v. Adams*, 961 F.2d 405, 423, 24 (3d Cir. 1992); *Step-Saver*, 912 F.2d at 649-50.

After careful and deliberate consideration of each of these factors, the Court finds that because Plaintiffs' claims fail to fit these requirements, their case is not ripe and the Court must dismiss it for lack of subject matter jurisdiction.[15]

**B**.     <u>Standing</u>

In addition to arguing that the present case is not ripe for decision at this time, Defendants also argue that Plaintiffs do not have standing as they have failed to demonstrate an injury that is not speculative. As discussed *supra*, the Court has found that none of the Plaintiffs have established that their claims are ripe and, thus, no case or controversy exists and the remaining issues raised by Defendants in their motion to dismiss are moot. Nevertheless, it merits mention that assuming *arguendo* that Plaintiffs were able to establish that their claims were ripe, they are not able to establish standing to sue at this time.[16]

---

[15] If the Court were to apply the *Abbott Laboratories* framework, the finding that Plaintiffs' claims are not ripe would not change. Given Defendants' ongoing administrative process, its public commitment to regulatory change, and the enforcement safe harbor, the Court finds that the issues presented in this case are unfit for judicial review and Plaintiffs will suffer no hardship from the Court's withholding of consideration at this time.

[16] Although the Court need not address this argument as it has already decided that Plaintiffs have not satisfied the standard legal ripeness requirements, it will do so as standing implicates many of the same concerns underlying the Court's ripeness analysis.

Standing "is a threshold jurisdictional requirement, derived from the 'case or controversy' language of Article III of the Constitution." *Public Interest Research Grp. of N.J., Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 117 (3d Cir. 1997). The United States Supreme Court has "always insisted on strict compliance with this jurisdictional standing requirement." *Raines v. Byrd*, 521 U.S. 811, 819 (1997).

Defendants attack Plaintiffs' standing to bring this suit because, according to Defendants, no harm is imminent as the safe harbor provision delays any potential enforcement action until at least January 2014 and because the ANPRM is in effect to change the objectionable regulations.

In *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990), the Supreme Court stated: "[W]e have said many times before and reiterate today: Allegations of possible future injury do not satisfy the requirements of Art[icle] III. A threatened injury must be certainly impending to constitute an injury in fact."

The United States Court of Appeals for the Third Circuit has summarized the constitutional standing requirements as follows: (1) the plaintiff must have suffered an injury in fact - an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the conduct complained of - the injury has to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Ballentine v. U.S.*, 486 F.3d 806, 814 (3d Cir. 2007). "In other words, the plaintiff must show that he or she personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant and the

injury must be concrete and capable of being redressed by the court should the plaintiff prevail on the merits." *Taliaferro v. Darby Twp. Zoning Bd.*, 458 F.3d 181, 188-89 (3d Cir. 2006).

In the present circumstances, the Court finds that Plaintiffs have failed to sufficiently allege an injury in fact to satisfy their burden to establish standing. First, the preventive care regulations do not apply to "grandfathered" health care plans and the majority of health care plans at issue in this litigation are "grandfathered." Second, for the one plan that is not grandfathered and even assuming *arguendo* that the other plans lost their grandfather status, the safe-harbor provisions render the threatened harm from the preventive care regulations too remote to constitute "imminent" injury. Finally, the Court must agree with Defendants that any injury from enforcement of the preventative care regulations after the safe harbor expires is purely speculative, as Defendants have formally declared their intention to amend the preventative care regulations before that time in order to accommodate the concerns of religious organizations about funding or facilitating access to preventive care services through their health care insurance coverage plans.

As Defendants point out, at this time, the challenged regulations cannot be enforced due to the safe harbor provisions and there is no authentic threat of imminent enforcement. To demonstrate an injury in fact, sufficient to maintain standing in this case, Plaintiffs must have suffered "an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (quotations and citations omitted).

At first blush, some factors alleged by Plaintiffs appear to suggest that Plaintiffs are presently suffering an injury.[17]  For example, Plaintiffs allege that they need lead time to plan for their employee health care plans,[18] and that they are unable to enter into collective bargaining agreement negotiations in January 2013, set tuition rates in February 2013, and make teacher retention decisions in April 2013, all because of the uncertainty regarding whether the regulations will be amended.   (Complaint ¶ 149).   However, to demonstrate an injury in fact, sufficient to maintain standing, Plaintiffs must have suffered an actual or imminent injury, not a conjectural or hypothetical  injury.   "Mere economic uncertainty affecting the plaintiff's planning is not sufficient to support premature review."  *Wilmac Corp. v. Bowen*, 811 F.2d 809, 813 (3d Cir. 1987).  *See also Tennessee Gas Pipeline Co. v. FERC*, 736 F.2d 747, 751 (D.C. Cir. 1984) (plaintiff's "planning insecurity" insufficient to establish hardship); *Bethlehem Steel Corp. v. EPA*, 536 F.2d 156, 162 (7th Cir. 1976) ("[C]laims of uncertainty in [plaintiff's] business and capital planning are not sufficient to warrant [ ] review of an ongoing administrative process."); *Belmont Abbey*, 2012 WL 2914417, at * 14 ("Costs stemming from Plaintiff's desire to prepare for contingencies are not sufficient, however, to constitute a hardship for purposes of the ripeness inquiry—particularly when the agency's promises and actions suggest the situation Plaintiff fears may not occur").  At the present time, the challenged regulations require nothing of Plaintiffs.

---

[17]  The Court finds that Plaintiffs' arguments that they are presently harmed because the third-party administrator of the employee health care plan has requested that they sign an indemnification agreement to be without merit as such argument depends entirely on the assumption that liability will be imposed for Plaintiffs' employee health care plan's failure to provide the prescribed services.

[18]  Defendants respond that because Plaintiffs' plan year begins on January 1, 2014, the regulations will have been amended, at the latest, several months before Plaintiffs will be subject to enforcement. "And even if plaintiffs' worst fears were to somehow come to pass, plaintiffs could then seek preliminary injunctive relief to preserve the status quo while the Court considers the merits of their claims."  Reply Br. at 10.

For example, Plaintiffs are required to demonstrate that there is some genuine threat of enforcement, which would raise the potential injury in this case beyond the speculative level. *See Lujan*, 504 U.S. at 564, n. 2 (requiring any alleged future injury to be "certainly impending").  Paragraphs 151 and 152 of the Complaint exemplify the speculative nature of Plaintiffs' alleged injuries in this case:

> 151.  The U.S. Government Mandate, however, **may require** Plaintiffs to make significant, and likely revolutionary changes, to their employee coverage. Plaintiffs, moreover, **may need** to restructure their programs or health plans to fit within the U.S. Government Mandate's requirements.  Such changes will require substantially more lead time.
>
> 152.  **Even assuming** Plaintiffs are entitled to the benefit of the safe harbor, Plaintiffs must be prepared to implement modified health coverage, **whatever that may end up being**, for their employee health plans by January 1, 2014.

Complaint at ¶¶ 151, 152 (emphasis added).

However, it is not disputed that Defendants have represented that they will not seek any enforcement, if at all, against Plaintiffs before January 2014, which further demonstrates the speculative nature of Plaintiffs' alleged injuries.  The attenuated nature of the threat of enforcement as pled in the Complaint confirms Defendants' argument that any harm in this case is purely speculative at this time.  *See Lujan*, 504 U.S. at 564.

Furthermore, Plaintiffs' allegations of injury rest entirely on Plaintiffs' speculation that the contested regulations in their current form will apply to Plaintiffs in January 2014.  However, Defendants have actively begun the process of amending the regulations to address the specific religious objections which Plaintiffs raise in this litigation.

For all these reasons, the Court finds that Plaintiffs have failed to establish the requisite injury in fact and, thus, have failed to demonstrate standing.

**C.** **Religious Employer Exemption and APA Claims**

1. *Religious Employer Exemption*

Plaintiffs argue that even if the motion to dismiss is granted, their challenge to the religious employer exemption and their APA claims should survive. In support of their position, Plaintiffs contend that Defendants' "consistent public position, outside of litigation, is that the narrow religious employer exemption is final, but that it will provide some alleged accommodation for non-exempt religious organizations." Sur-Reply at 1. Defendants respond that "it is pure speculation to suggest that the amended regulations will not address this concern as well" as Defendants "have not foreclosed the possibility that the amendment process will alter the religious employer exemption." Reply at 15.

The ANPRM specifically states that Defendants are seeking to protect religious organizations that object to the coverage of contraceptive services for religious reasons and **that are not exempt** under the final regulations published February 15, 2012. By the plain language of the ANPRM, it therefore appears doubtful that the "religious employer" definition will be amended.[19] However, with that said, the Court finds that Plaintiffs lack standing at this time to challenge the "religious employer" exemption as they have suffered no present injury because their health care plans are "grandfathered" and they are protected against any enforcement action by the safe harbor provision of the regulations.

2. *APA Claims*

Section 704 of the APA provides that a "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review." 5 U.S.C. § 704. The statutory

---

[19] Moreover, in a similar case pending in the United States Court for the Middle District of Tennessee, the Government attorney stated that it was his "understanding from the agencies that the religious employer exemption is not actively undergoing the amendment process." *Diocese of Nashville v. Sebelius*, No. 3:12-cv-934, Transcript.

language of the APA does not explicitly define what qualifies as "final" agency action. *Hindes v. FDIC,* 137 F.3d 148, 162 (3d Cir. 1998). "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992); *see also Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (noting that for agency action to be final: (1) it must mark the consummation of the decisionmaking process; and (2) rights must be determined or legal consequences must flow from action). Agency action is generally not considered ripe for review "until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action . . . that harms or threatens to harm [the plaintiff]." *Nat'l Park Hospitality Ass'n*, 538 U.S. at 808 (quoting *Lujan*, 497 U.S. 871, 891 (1990)).

Courts have been pragmatic when interpreting the finality element of ripeness under the APA. *See Standard Oil*, 449 U.S. at 239; *see also CEC Energy Co., Inc. v. Pub. Serv. Comm'n of the V.I.*, 891 F.2d 1107, 1110 (3d Cir. 1989); *Hindes*, 137 F.3d at 162 (noting that finality of agency action is determined by its consequences or practical effects). Additionally, the Court of Appeals for the Third Circuit has listed numerous factors that must be considered in assessing finality, which overlap significantly with the aforementioned factors for ripeness. *See CEC Energy Co*., 891 F.2d at 1110. The finality factors include:

> (1) whether the decision represents the agency's definitive position on the question; (2) whether the decision has the status of law with the expectation of immediate compliance; (3) whether the decision has immediate impact on the day-to-day operations of the party seeking review; (4) whether the decision involves a pure question of law that does not require further factual development; and (5) whether immediate judicial review would speed enforcement of the relevant act.

*Solar Turbines Inc*., 879 F.2d at 1080 (*citing Standard Oil*, 449 U.S. at 239-40).

The Court finds that each of these factors weighs against a determination that Plaintiffs' claims are ripe.   First, while the regulations are "final," by virtue of having been formally promulgated, the regulations do not represent the Defendants' "definitive position on the question" as Defendants  have initiated a formal amendment process of these regulations. Second,  as discussed at length *supra*, at the current time there is no expectation of immediate compliance by either Plaintiffs or Defendants.  Third, any decision the Court would make today would not have an immediate impact on Plaintiffs' day-to-day operations as the existing regulations are currently under review and are expected to be modified.  Next, any decision clearly requires further factual development as the current controversy at this time is based on contingent facts.  Finally, immediate judicial review would not speed enforcement as Plaintiffs are not subject to any potential enforcement action before January 2014, if at all.

For these reasons, the Court finds that  the finality element of ripeness under the APA is not present at this time.

## Conclusion

For all the foregoing reasons, the Motion to Dismiss filed by Defendants will be granted and the Plaintiffs' Complaint will be dismissed in its entirety without prejudice.

An appropriate Order follows.

McVerry, J.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MOST REVEREND DAVID A ZUBIK, )<br>BISHOP OF THE ROMAN CATHOLIC )<br>DIOCESE OF PITTSBURGH, as Trustee of )<br>The Roman Catholic Diocese of Pittsburgh, a )<br>Charitable Trust; The ROMAN CATHOLIC )<br>DIOCESE OF PITTSBURGH; CATHOLIC )<br>CHARITIES OF THE DIOCESE OF )<br>PITTSBURGH, INC., an affiliate nonprofit )<br>corporation of The Roman Catholic Diocese of )<br>Pittsburgh; and THE CATHOLIC )<br>CEMETERIES ASSOCIATION OF THE )<br>DIOCESE OF PITTSBURGH, an affiliate )<br>nonprofit corporation of The Roman Catholic )<br>Diocese of Pittsburgh, )<br>        Plaintiffs, )<br>    v. )<br> )<br>KATHLEEN SEBELIUS, in her official )<br>capacity as Secretary of the U.S. Department of )<br>Health and Human Services; HILDA SOLIS, in )<br>her official capacity as Secretary of the U.S. )<br>Department of Labor; TIMOTHY GEITHNER, )<br>in his official capacity as Secretary of the U.S. )<br>Department of Treasury; U.S. DEPARTMENT OF )<br>HEALTH AND HUMAN SERVICES; )<br>U.S. DEPARTMENT OF LABOR; and )<br>U.S. DEPARTMENT OF TREASURY, )<br>        Defendants. ) | 12-cv-00676 |

## ORDER OF COURT

**AND NOW**, this 27th day of November, 2012, it is hereby **ORDERED, ADJUDGED**

**AND DECREED** that the Motion to Dismiss is **GRANTED** and all counts of Plaintiff's

Complaint are dismissed without prejudice pursuant to Federal Rule of Civil Procedure 12(b)(1).

    The Clerk of Court shall docket this case closed.

                                    BY THE COURT:
                                    <u>s/ Terrence F. McVerry</u>
                                    United States District Court Judge

cc: John D. Goetz, Esquire
Jones Day
Email: jdgoetz@jonesday.com

Leon F. DeJulius, Esquire
Jones Day
Email: lfdejulius@jonesday.com

Paul M. Pohl, Esquire
Jones Day
Email: pmpohl@jonesday.com

Ira M. Karoll, Esquire
Jones Day
Email: ikaroll@jonesday.com

Laura E. Ellsworth, Esquire
Jones Day
Email: leellsworth@jonesday.com

Mary Pat Stahler, Esquire
Jones Day
Email: mstahler@jonesday.com

Rita Ferko Joyce
Diocese of Pittsburgh
Email: rjoyce@diopitt.org

Bradley P. Humphreys
U.S. Department of Justice, Civil Division, Federal Programs
Email: bradley.p.humphreys@usdoj.gov